IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| GABRIELLA L. JONES, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No.  3:15-CV-3046-L (BH) |
| | § | |
| CAROLYN COLVIN, ACTING, | § | |
| COMMISSIONER OF THE SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | Referred to U.S. Magistrate Judge |

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION

Pursuant to *Special Order No. 3-251*, this case was automatically referred for issuance of findings, conclusions, and recommendation.  Before the Court is *Plaintiff's Appeal from the Decision of the Commissioner of Social Security*, filed December 23, 2015 (doc. 16), *Defendant's Response Brief*, filed January 22, 2016 (doc. 18), and *Plaintiff's Reply to Brief of Defendant*, filed February 10, 2016 (doc. 19).  Based on the relevant filings, evidence, and applicable law, the Commissioner's decision should be **AFFIRMED**.

## I.   BACKGROUND[1]

### A.   Procedural History

Gabriella L. Jones (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying her claim for disability insurance benefits (DIB) under Title II of the Social Security Act (Act).  On September 29, 2008, she applied for DIB, alleging disability beginning on January 12, 2008. (R. at 103-12.)  Her claim was initially denied on March 31, 2009, and upon reconsideration on July 16, 2009.  (R. at 54-57, 60-62.)  On July 21, 2009, she

---

[1]  The background information comes from the transcript of the administrative proceedings, which is designated as "R."

requested a hearing before an administrative law judge (ALJ). (R. at 60-67.) She appeared and testified at a hearing on November 16, 2009. (R. at 31-51.) The first ALJ denied Plaintiff's applications on February 25, 2010, finding her not disabled. (R. at 12-26.) Plaintiff timely appealed the first ALJ's decision to the Appeals Council. (R. at 6-7.) The Appeals Council denied her request for review and the first ALJ's decision became the final decision of the Commissioner. (R. at 1-3.) Plaintiff timely appealed the Appeals Council's decision under 42 U.S.C. § 405(g).

On July 21, 2011, the first ALJ's decision was reversed and remanded by the district court for further proceedings in *Jones v. Astrue*, No. 3:10–CV–2317–M–BK, 2011 WL 2924093 (N.D. Tex. June 22, 2011), *adopted by* 2011 WL 2938271 (N.D. Tex. July 21, 2011). (R. at 358-70.) The Appeals Council remanded the case to the first ALJ on September 21, 2011, to comply with the district court's order. (R. 371-73.) The first ALJ conducted a hearing for the purpose of obtaining Plaintiff's testimony on October 9, 2012, and a supplemental hearing to obtain the testimony of medical expert Steven Goldstein, M.D. and a vocational expert on January 9, 2013. (R. 264-96; R. 297-312). The first ALJ denied Plaintiff's applications on January 22, 2013, finding her not disabled. (R. 375-389). Plaintiff appealed the first ALJ's decision to the Appeals Council, and on April 10, 2014, the Appeals Council remanded the case to the second ALJ for further proceedings.[2] (R. at 390-395).

The second ALJ conducted a hearing on December 4, 2014. (R. 313-39). Plaintiff

---

[2]  In part, the Appeals Council remanded the case for the ALJ to:

> Make definitive findings to explain which of the claimant's alleged impairments and impairments established in the record are severe. In so doing, consider whether the *claimant's bilateral carpal tunnel syndrome* was an additional severe medically determinable impairment during the period at issue.

(R. at 393) (emphasis added).

personally appeared and testified.  (*Id.*)  On March 27, 2015, the second ALJ issued a decision finding Plaintiff not disabled.  (R. at 250-58.)  She timely appealed the second ALJ's decision to the Appeals Council.  (R. at 241-46.)  The Appeals Council denied her request for review on July 31, 2015.  (R. at 235-39.) Plaintiff timely appealed the Appeals Council's decision under 42 U.S.C. § 405(g).

## B.    Factual History

### 1.    Age, Education, and Work Experience

Plaintiff was born on June 6, 1956, and was 58 years old at the time of the hearing on December 4, 2014 before the second ALJ.  (R. at 319.)  She completed the twelfth grade and had vocational training in secretarial science.  (*Id.*)  She had past relevant work as an apartment manager.  (R. at 258.)

### 2.    Medical Evidence

On January 22, 2008, Plaintiff was examined by William F. Larkin, M.D.[3]  (R. at 180).  She reported a history of cervical strain, including neck pain that traveled down both arms.  (*Id.*)  Dr. Larkin's examination included a CT scan of her spine.  (*Id.*)  The scan showed multilevel cervical spondylotic changes, diminished disc space heights at C5-6 and C6-7, and a mild right greater than left foraminal stenosis at C6-7.  (R. at 180-81, 599.)  Dr. Larkin noted that the scan showed no obvious central spinal stenosis at any level. (*Id.*)

Dr. Larkin referred Plaintiff to Kathy A. Toler, M.D.  (R. at 183.)  On February 8, 2008, Plaintiff reported that:

> for the last two months, she has noticed pain in the writs and numbness and tingling
> in the hands. She states that the left hand is more involved than the right. She states

---

[3]  Although the records appear to begin on January 22, 2008, Dr. Larkin later signed a letter stating that he first saw Plaintiff on January 15, 2008.  (R. at 182.)

that he hands will oftentimes wake her up at night from sleep. She has also noticed
weakness in her hands, mostly on the left. All of the fingers seem to be involved
equally. She also complains of pain in her cervic region as well, but there is no
radiating pain into the arms or hands.

(R. at 183.)  Dr. Toler found that the bulk and tone of Plaintiff's muscles were normal, but that

"[s]he had a great deal of tenderness in the flaxor surface of the forearm and in the wrist region."

(*Id.*)  She performed electrodiagnostic testing, and "[t]he nerve conduction study in the upper

extremities and EMG in the cervical region and bilateral upper extremities [were] normal."  (R. at

184)  Additionally, she found no evidence for cervical radiculopathy or entrapment neuropathy of

the upper extremities.  (*Id.*)  She noted in her report, however, that "normal electrodiagnostic testing

does not rule out the presence of carpal tunnel."  (*Id.*)  She diagnosed plaintiff with (1) tenosynovitis

of the wrist and forearm bilaterally, and (2) early bilateral carpal tunnel.  (*Id.*)  Dr. Toler gave

Plaintiff wrist splints to wear at night and directed her to continue to take anti-inflammatory

medication as needed.  (*Id.*)

Plaintiff had 28 sessions of therapy with Dr. Larkin between February 18, 2008, and June

2, 2008.  (R. at 199-213.)  She made no progress to increase her strength or to return to pre-injury

activities during those sessions.  (*Id.*)  Additionally,  progress was made only some of the weeks to

decrease pain and increase her range of motion.  (*Id*.)

Dr. Larkin completed an Attending Physician's Statement for Continued Disability Claim

with Assurity Life Insurance Company (Assurity form) on June 2, 2008.  (R. at 195-96.)  He

diagnosed her with bilateral carpal tunnel syndrome and bilateral foraminal stenosis C-6,7, and

reported that her treatment consisted of daily physical therapy.  (*Id.*)  He identified her physical

impairment as "severe" and found that her functional capacity was limited to the extent that she was

"incapable of minimal (sedentary) activity."  (*Id.*)  He noted that he expected a fundamental or

4

marked change within 4-6 months, and that trial employment could begin at that time. (R. at 196.) Between July 31, 2008, and March 27, 2009, Dr. Larkin completed four more Assurity forms, stating that Plaintiff's condition had "not changed," and pushing back his progress and rehabilitation estimates. (*See* R. at 188-89, 197-98, 216-19.)

On March 1, 2009, in her Functional Report – Adult, Plaintiff reported that she could drive, shop for household items, prepare light meals, pay bills, handle a savings account, and use a check book.[4] (R. at 137-44.) She reported difficulty, however, in using buttons when dressing, bathing, and combing/brushing her hair. (R. at 138.)

On March 3, 2009, Dr. Larkin completed an additional report to Assurity regarding Plaintiff's condition. (R. at 220-21.) He noted that Plaintiff continued to have physical therapy four times per week and a doctor's evaluation twice a month. (R. at 220.) Additionally, he noted that he did not recommend surgery. (*Id.*)

On March 4, 2009, Plaintiff had a consultative physical examination with Anuradha Tavarekere, M.D., for a disability evaluation. (R. at 222-25). Dr. Tavarekere noted Plaintiff's chief complaint was bilateral tenosynovitis in the wrists, arm numbness, and neck pain. (R. at 223.) Plaintiff reported to Dr. Tavarekere that her neck and bilateral wrist pain had been present for one year, but symptoms worsened after a motor vehicle accident one and one-half weeks prior to evaluation. (R. at 223.) She described the wrist pain as sharp, intermittent pain associated with numbness and tingling. (*Id.*) Plaintiff reported that the pain worsened with activity, but was "relieved with heat and wearing a splint." (*Id.*) Dr. Tavarekere reported that Plaintiff took mobic and hydrocodone for her neck pain, and mobic, tylenol, and hydrocodone for her bilateral wrist pain.

---

[4]  The exhibit list identifies this as an undated document, however, the last page of the exhibit appears to show that Plaintiff completed the form on March 1, 2009. (R. at 144.)

(*Id.*)  Plaintiff reported to Dr. Tavarekere that she could walk for 1 block, stand for 10 minutes, sit for 20 minutes, squat, and watch TV, but she could not do housework, grocery shopping, cooking, or laundry.  (*Id.*)  Additionally, Plaintiff reported to Dr. Tavarekere that she could hold a coffee cup, open jar tops, hold a light skillet, use a broom, and button clothes.  (*Id.*)

Dr. Tavarekere observed that Plaintiff walked stiffly and held her neck stiffly.  (R. at 224-25.)  She also observed that Plaintiff had normal gait and station, was able to stand on her heels and toes, bend and get back up without difficulty, squat and get back up without difficulty, get on and off the table without difficulty, and handle small objects.  (*Id.*)  Dr. Tavarekere concluded Plaintiff suffered from bilateral wrist pain that may be secondary to tenosynovitis, "neck pain - cervical sprain, degenerative disk disease," and arm numbness secondary to cervical degenerative disk disease.  (R. at 225.)  According to the diagnostic radiologist who performed X-rays later that day, Bruce A. Cheatham, M.D., Plaintiff's X-rays revealed "[m]inimal circumferential wrist soft tissue swelling only."  (R. at 226.)

On March 26, 2009, Eugenia Goodman, M.D., assessed Plaintiff's medical records as part of her disability determination.  (R. at 227.)  Dr. Goodman listed Plaintiff's medically determinable impairments as bilateral wrist pain, neck pain, and cervical DDD.  (*Id.*)  He noted that the "alleged limitations due to physical impairment [were] not fully supported by EOR."  (*Id.*)  Jeanine Kwun, M.D., reviewed and affirmed Dr. Goodman's assessment on July 15, 2009.  (R. at 228.)

On March 30, 2009, in a letter from Plaintiff's then-attorney to Dr. Larkin, Plaintiff agreed to pay Dr. Larkin out of recovered benefits, if any.  (R. at 596.)  The letter stated:

> This will confirm that this firm has agreed to guarantee payment to Dr. William Larkin, for the account of [Plaintiff], out of any recovery for past medical expenses obtained in this case. Of course, if no recovery for past medical expenses is obtained [the law firm] assumes no responsibility for the debt in question. We merely agree,

with our clients' [sic] consent, to pay you directly out of any recovery that would be payable to the client, for past medical expenses obtained on her behalf.

(*Id.*)

On July 21, 2009, Dr. Larkin completed another Assurity form. (R. at 229, 603-04.) He continued to identify her physical impairments as severe and noted no change in her progress. (R. at 229-30.)

On September 22, 2009, Dr. Larkin completed a physical capacity form for Plaintiff. (R. at 231.) He listed her impairments as bilateral carpal tunnel syndrome, multilevel cervical spondylotic changes, and left foraminal stenosis C 6-7. (R. at 231.) According to Dr. Larkin, Plaintiff's prognosis for marked improvement or complete recovery was "poor." (*Id.*) Additionally, due to her medical problems, he noted that she could not work. (*Id.*) He also identified limitations, including the inability to lift 5 pounds in a competitive work situation, and the ability to only sit and stand/stand for 2 hours each. (*Id.*)

Dr. Larkin also provided various progress notes from March 12, 2009, to October 1, 2009, noting "no real change." (*See* R. at 232-34.) On February 9, 2010, and September 28, 2010, Dr. Larkin completed additional Assurity forms noting that Plaintiff was continuing to have daily physical therapy 4 times per week, but that her condition had not changed. (R. at 609-10, 605-06.)

On October 8, 2012, Dr. Larkin completed a clinical assessment of pain for Plaintiff. (R. at 619-20.) It stated that her "[p]ain [was] present to such an extent as to be distracting to adequate performance of daily activities or work." (R. at 619.) Additionally, physical activity—such as walking, standing, sitting, bending, stooping, and moving extremities—"[g]reatly increased pain to such a degree as to cause some distraction from task or total abandonment of task." (*Id.*) Finally, Dr. Larkin opined that Plaintiff's "[d]rug side effects [could] be expected to be severe and to limit

effectiveness due to distraction, inattention, drowsiness, and etc." (R. at 620.)

On July 21, 2011, Dr. Larkin completed an Assurity form noting that Plaintiff continued to have daily physical therapy 4 times per week, but that her condition had not changed. (R. at 584.) He also noted that no fundamental or marked change was expected in the future, but that Plaintiff was ambulatory. (R. at 584-85.) Dr. Larkin made a similar analysis on March 26, 2012, and he specifically noted at that time that Plaintiff had not improved in physical therapy. (R. at 582-83.)

On October 8, 2012, Dr. Larkin completed a cervical spine residual functional capacity questionnaire, which noted chronic pain and a "poor prognosis" for Plaintiff. (R. at 621-25.) He reported significant limitation in her motion, and that she was "[i]ncapable of even 'low stress' jobs" because of "constant pain in [her] hands." (R. at 621, 623.) He opined that she would need to take unscheduled breaks during an 8-hour work day, and that her symptoms would "frequently" interfere with her attention and concentration. (R. at 624.) He concluded that Plaintiff could lift and carry less than 10 pounds, but never more than 10 pounds; occasionally turn her head right and left, twist, stoop, or climb stair; rarely look down (sustained flexion of the neck), look up, hold head in a static position, or crouch/squat; and never climb ladders. (R. at 624-25.)

Dr. Larkin also provided various progress notes from August 2, 2012 to July 31, 2014, which noted "no real change." (*See* R. at 626-29.)

### 3.    January 9, 2013 Hearing Testimony[5]

On January 9, 2013, a medical expert (ME) testified at a hearing before the first ALJ. (R. at 297-312.) Plaintiff was present and represented by an attorney. (R. at 297.)

The ME testified that, according to the medical records, Plaintiff had cervical spondylosis.

---

[5] The second ALJ relied on the vocational expert (VE) testimony provided at the hearing on December 4, 2014, instead of the VE testimony at the January 9, 2013 hearing before the first ALJ, (*see* R. at 250-58), so the January 9, 2013 VE testimony is not recited.

(R. at 301.)  In response to a question from the first ALJ regarding the severity of Plaintiff's impairments, the ME stated that the extent of the severity of the impairment was "not correlated very well with the physical examination." (*Id.*)  He noted that Plaintiff's medical records did not include "any careful neurological examination," even though Dr. Larkin "describe[d] a marked decrease in range of motion of her neck and [said] that [she was] in severe pain." (*Id.*)  Additionally, the ME noted that tests show Plaintiff had "early bilateral carpal tunnel, but . . . it's very minor." (R. at 302.) Finally, in response to questioning from the first ALJ regarding Plaintiff's limitations, the ME opined that Plaintiff could perform a light level of activity. (*Id.*)

Plaintiff's attorney questioned the ME on Dr. Larkin's diagnosis of tenosynovitis. (*Id.*)  In response, he testified "[Dr. Larkin] keeps saying that over and over agin, but I can't see in a physical examination how he figured that one out." (R. at 303.)

Plaintiff's attorney then asked the ME to opine whether an individual with a combination of tenosynovitis and carpal tunnel syndrome could have limitations on the use of her upper extremities. (*Id.*)  The ME opined, "It's certainly possible, yes." (*Id.*)  Plaintiff's attorney then asked whether a doctor would recommend restriction on performing repetitive movements with the upper extremities. (*Id.*)  The ME responded that normal treatment would be to prescribe a splint. (*Id.*)  Plaintiff's attorney then asked if the combination of bilateral carpal tunnel syndrome and tenosynovitis could affect repetitive function with the hands and fingers. (*Id.*)  The ME responded that "theoretically," the combination could. (R. at 304.)

### 4.   December 4, 2014 Hearing Testimony

On December 4, 2014, Plaintiff and a vocational expert (VE) testified at a hearing before the second ALJ. (R. at 313-39.)  Plaintiff was represented by an attorney. (R. at 315.)

### a.    Plaintiff's Testimony

Plaintiff testified that she was 58 years old, 5 feet and 7.5 inches tall, and weighed 170 pounds. (R. at 320.)  She lived with her husband and daughter in a house.  (R. at 318.)  She alleged that she became disabled on January 12, 2008.  (R. at 317.)

From 1996-2008, Plaintiff worked as a property manager.  (R. at 320.)  As part of her duties, she would "walk properties," which included making sure units were ready to be rented, units were occupied, and the property was ready for monthly inspections.  (R. at 320-21.)  She also ensured tenants were paying their rent on time, input work orders, and completed daily reports.  (R. at 321.)  She was also required to go up and down stairs and lift files.  (Id.)  She stopped working because of daily wrist, neck, and back pain, and had not been employed since 2008.  (R. at 322.)

Plaintiff described her symptoms as "excruciating pain . . . from [her] wrist to [her] neck . . . and [her] arms and [her] elbows . . . ."  (R. at 322-23.)  Without medication, pain in her neck and hands averaged a 7 out of 10.[6]  (R. at 334-35.)  With prescription medication, it averaged a 6 out of 10.  (R. at 225.)  At the time of the hearing, she was taking prescription and over-the-counter Tylenol for her pain.  (R. at 326.)  Plaintiff would also lay down for "[a] couple of hours" when she had a headache, and use heating pads, clay pads, weekly therapy, numbing cream, and wrist bands and splints for treatment.  (R. at 324-26.)  Plaintiff's doctor did not recommend surgery and continued therapy.  (R. at 330-31.)

Plaintiff testified that she spent her days reading on her Kindle, which sat on a stand.  (R. at 332.)  She used to type and handwrite a lot, but her wrists would lock up, and her fingers would feel numb and swollen.  (R. at 328-29.)  She was unable to get out of the tub by herself because of

---

[6]  Plaintiff initially stated that her pain averaged a 9 out of 10.  (R. at 334.)  After clarification from the second ALJ that "10 is basically the last pain you're going to feel before you pass out," Plaintiff changed her answer to 7 out of 10 without medication.  (Id.)

muscle strength, and she could not lift skillets or chop because of wrist pain.  (R. at 329.)  She did not do any housework and "very little" cooking, but she did drive "some" to "the store or CVS or something."  (R. at 329, 332-33.)  She did not go to the store by herself, however.  (R. at 331-32.)  Upon questioning, Plaintiff estimated that she drove between 30 minutes and an hour per week, total.  (R. at 333.)   She could stand for between 30-45 minutes, but her back pain kept her from standing for longer.  (R. at 331.)  She could walk for half an hour, but if she walked longer than that, she had back pain and got winded.  (R. at 320.)  She could can sit for an hour, and lift and carry approximately five pounds.  (R. at 331.)

### b.     VE's Testimony

The VE testified that Plaintiff had past relevant work as an apartment house manager (186.167-018, light, SVP: 5).  (R. at 336.)

The second ALJ asked the VE to consider a hypothetical person who had Plaintiff's age, education, and work history.  (*Id.*)  The hypothetical person could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and walk 6-8 hours; and sit 6 of 8 hours per day, but could not climb ladders, ropes, or scaffolds;  occasionally crawl; and frequently reach, handle, and finger.  (*Id.*)  The second ALJ asked if that hypothetical individual could perform Plaintiff's past work.  (*Id.*)  The VE opined that the hypothetical person could perform the past work. (*Id.*)

Plaintiff's attorney asked the VE to assume that the hypothetical person could walk no more than 30 minutes at a time, stand no more than 30-45 minutes at a time, sit no more than an hour at a time, and lift and carry no more than 5 pounds.  (R. at 336-37.)  He then asked if the hypothetical person could perform Plaintiff's past work.  (R. at 337.)  The VE responded no.[7]  (*Id.*)

---

[7]   The VE initially responded that the hypothetical person could perform Plaintiff's past work, but revised his answer upon further questioning because he did not hear the attorney's lifting restriction.  (R. at 337.)

The attorney then added that the hypothetical person had to lie down for several hours during the course of a work day, and asked if that person could perform Plaintiff's past work. (Id.) The VE responded no. (Id.) The attorney then asked the VE to assume that reaching, handling, fingering, and feeling was limited to no more than an occasional basis only, and he asked if such a person could perform Plaintiff's past work. (Id.) The VE responded no. (Id.)

The attorney asked the VE if Plaintiff's past work, which the VE identified as SVP: 5, was at least semiskilled. (R. at 337-38.) The VE responded that it was skilled. (R. at 338.) The attorney then added that the hypothetical person could not maintain attention and concentration on work tasks at least 10 percent of the time and asked if this would have any adverse effect on performing Plaintiff's past work. (Id.) The VE responded yes. (Id.) The attorney asked if it was likely that the hypothetical person could not retain employment in that work, and the VE responded yes. (Id.)

Upon questioning by the second ALJ, the VE testified that his testimony did not conflict with the Dictionary of Occupational Titles (DOT). (Id.) The VE further testified that his testimony regarding being off task and lying down are not included in the DOT, but that his testimony was based on his professional opinion. (R. at 338-39.)

C.   **The ALJ's Findings**

The second ALJ issued her decision denying benefits on March 27, 2015. (R. at 258.) At step one,[8] she found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of January 12, 2008, through her date last insured of December 31, 2012. (R. at 253.) At step two, she found that Plaintiff had the following severe impairments: cervical spondylosis,

---

[8] A five-step analysis is used to determine whether a claimant is disabled under the Social Security Act, which is described more fully below.

tenosynovitis, and early carpal tunnel syndrome.[9]  (*Id.*)  Despite those impairments, at step three, she found that Plaintiff had no impairment or combination of impairments that met or equaled the severity of one of the impairments listed in the social security regulations.  (*Id.*)  Next, the second ALJ determined that Plaintiff had the following RFC: she could lift and carry 10 pounds frequently and 12 pounds occasionally; stand and walk a total of 6 hours during and 8 hour workday; sit a total of 6 hours during and 8 hour workday; frequently reach, handle, and finger; occasionally crawl; and could not climb ladders, ropes, or scaffolds.  (*Id.*)

At step four, the second ALJ found that Plaintiff was capable of performing her past relevant work.  (R. at 258.)  Accordingly, the second ALJ determined that Plaintiff had not been under a disability, as defined by the Social Security Act, from her onset date through the date of decision. (*Id.*)

## II.   ANALYSIS

### A.   <u>Legal Standards</u>

#### 1.   **Standard of Review**

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence.  *Greenspan v. Shalala*, 38 F.3d 232, 236

---

[9]   In her decision, the second ALJ wrote that Plaintiff's severe impairments were "cervical spondylosis, tenosynovitis, and *early cervical tunnel syndrome*." (R. at 253) (emphasis added).  Defendant contends that this was a typographical error and that "early cervical tunnel syndrome," which is not a medically recognized impairment, should have read "early carpal tunnel syndrome." (doc. 18 at 2.)  Plaintiff does not dispute that this was a typographical error. (doc. 19 at 6.) Additionally, the Appeals Council specifically directed the second ALJ to, in part, "consider whether the claimant's *bilateral carpal tunnel syndrome* was an additional severe medically determinable impairment during the period at issue." (R. at 393) (emphasis added).  In determining Plaintiff's RFC, the second ALJ also expressly considered Dr. Toler's diagnosis of "tenosynovitis of the wrist and forearm bilaterally and *early bilateral carpal tunnel*." (R. at 255) (emphasis added).  Accordingly, the Court finds that the second ALJ made a typographical error, and that the she found that Plaintiff had the following severe impairments: cervical spondylosis, tenosynovitis, and early carpal tunnel syndrome at step two.

(5th Cir. 1994); 42 U.S.C. § 405(g). "Substantial evidence is that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance." *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995) (quoting *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992)).  In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236.  A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 n. 1 (5th Cir. 1985).  Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *Id.* Thus, the Court may rely on decisions in both areas without distinction in reviewing an ALJ's decision. *Id.* at 436 and n.1.

## 2.      Disability Determination

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64.  The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42

U.S.C. § 423(d)(1)(A). When a claimant's insured status has expired, the claimant "must not only

prove" disability, but that the disability existed "prior to the expiration of [his or] her insured status."

*Anthony*, 954 F.2d at 295. An "impairment which had its onset or became disabling after the special

earnings test was last met cannot serve as the basis for a finding of disability." *Owens v. Heckler*,

770 F.2d 1276, 1280 (5th Cir. 1985).

     The Commissioner utilizes a sequential five-step analysis to determine whether a claimant

is disabled:

1.     An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.     An individual who does not have a "severe impairment" will not be found to be disabled.

3.     An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.     If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.     If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)

(currently 20 C.F.R. § 404.1520(a)(4)(i)-(v) (2012)). Under the first four steps of the analysis, the

burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates

if the Commissioner determines at any point during the first four steps that the claimant is disabled

or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the

burden shifts to the Commissioner at step five to show that there is other gainful employment

available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d

15

at 236.  This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence.  *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).  After the Commissioner fulfills this burden, the burden shifts back to the claimant to show that he cannot perform the alternate work.  *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005).  "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis."  *Loveland v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

## B.    Issues for Review

Plaintiff raises three issues for review:

1.    Did the Commissioner comply with the direct order of this Court to use the proper legal standard to evaluate Plaintiff's severe impairments?

2.    Did the Commissioner properly consider the medical opinions and functional limitations described by Plaintiff's treating physicians in determining her residual functional capacity (RFC)?

3.    Did the Commissioner properly evaluate credibility?

(doc. 16 at 2.)

## C.    Severity Standard

Plaintiff argues that the second ALJ applied an improper standard to evaluate her severe impairments.  (doc. 16 at 5.)

### *1.    Stone Standard*

At step two of the sequential evaluation process, the ALJ "must consider the medical severity of [the claimant's] impairments."  20 C.F.R. § 404.1520(a)(4)(ii),(c) (2012).  To comply with this regulation, the ALJ "must determine whether any identified impairments are 'severe' or 'not severe.'"  *Herrera v. Comm'r of Soc. Sec.*, 406 F. App'x 899, 903 (5th Cir. 2010).  Pursuant to the

Commissioner's regulations, a severe impairment is "any impairment or combination of impairments which significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). The Fifth Circuit has held that an impairment is not severe "only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work." *Stone v. Heckler*, 752 F.2d 1099, 1101, 1104-05 (5th Cir. 1985). Accordingly, to meet the severity threshold at step two, "the claimant need only . . . make a *de minimis* showing that her impairment is severe enough to interfere with her ability to do work." *Anthony v. Sullivan*, 954 F.2d 289, 294 n.5 (5th Cir. 1992) (citation omitted). "Because a determination [of] whether an impairment[ ] is severe requires an assessment of the functionally limiting effects of an impairment[ ], [all] symptom-related limitations and restrictions must be considered at this step." SSR 96-3P, 1996 WL 374181, at *2 (S.S.A. July 2, 1996). Ultimately, a severity determination may not be "made without regard to the individual's ability to perform substantial gainful activity." *Stone*, 752 F.2d at 1104.

Here, in reciting the applicable law, the second ALJ stated that "[a]n impairment or combination of impairments is 'severe' within the meaning of the regulations if it *significantly* limits an individual's ability to perform basic work activities." (R. at 252) (emphasis added) (citing to 20 C.F.R. § 404.1520(c)). The second ALJ further stated that "[a]n impairment or combination of impairments is 'not severe' when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have *no more than a minimal effect* on an individual's ability to work." (R. at 251-52) (emphasis added) (citing 20 C.F.R. § 404.1520; Social Security Ruling (SSR) 85–28, 96-3p, and 96-4p). The second ALJ did not cite to *Stone*. (*See* R. at 251-53.)

*Stone* provides no allowance for a minimal, and much less a significant, interference with a claimant's ability to work.   Given the difference between these two constructions and *Stone*, coupled with the second ALJ's failure to specify which standard she actually applied in her disability evaluation, the second ALJ applied an incorrect standard of severity.   *See Garcia v. Astrue*, No. 3:08–CV–1881–BD, 2010 WL 304241, at *3 (N.D. Tex. Jan.26, 2010) (explaining that courts in this district have consistently rejected, as inconsistent with *Stone*, the definition of severity under 20 C.F.R. § 404.1520(c) that the ALJ cited in this case); *see also Lawson v. Astrue*, No. 4:11–CV–00426, 2013 WL 449298, at *4 (E.D. Tex. Feb.6, 2013) ("while the difference between the two statements appears slight, it is clear that the [regulatory definition] is not an express statement of the *Stone* standard").

### 2.      Harmless Error

Even where the ALJ fails to specifically determine the severity of a claimant's impairments at step two, remand is not required where the ALJ proceeds to the remaining steps of the disability analysis and considers the alleged impairment's —or its symptoms—effects on the claimant's ability to work at those steps.   *See, e.g., Herrera*, 406 F. App'x at 3 & n.2; *Abra v. Colvin*, No. 3:12-CV-1632-BN, 2013 WL 5178151, at *4 (N.D. Tex. Sept. 16, 2013) (listing cases).   An ALJ's failure to apply the correct standard at step two in determining the severity of the claimant's impairments (i.e., *Stone* error) "does not mandate automatic reversal and remand, and application of harmless error analysis is appropriate [ ] where the ALJ proceeds past step two in the sequential evaluation process."   *Gibbons v. Colvin*, No. 3:12-CV-0427-BH, 2013 WL 1293902, at *14 (N.D. Tex. Mar. 30, 2013) (citing cases); *accord Newbauer v. Colvin*, No. 3:14-CV-3548-BH, 2016 WL 1090665, at *15 (N.D. Tex. Mar. 21, 2016) (applying harmless error analysis); *see also Taylor v.*

*Astrue*, 706 F.3d 600, 603 (5th Cir. 2012) (per curiam) (applying harmless error analysis where the ALJ failed to cite *Stone* in finding at step two that the claimant's alleged mental impairment was non-severe).   Accordingly, Plaintiff must show that the second ALJ's step two error was not harmless.   *See Garcia v. Astrue*, No. CIV. M-08-264, 2012 WL 13716, at *12 (S.D. Tex. Jan. 3, 2012) ("Assuming . . . that the ALJ erred in failing to specifically address whether Plaintiff's right leg venous thrombosis was a severe impairment, the next question is whether the ALJ committed reversible error.").   In the Fifth Circuit, harmless error exists when it is "inconceivable" that a different administrative determination would have been reached absent the error.   *Bornette v. Barnhart*, 466 F. Supp. 2d 811, 816 (E.D. Tex. 2006) (citing *Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003)).

Here, Plaintiff argues that the *Stone* error was not harmless and requires remand because the second ALJ failed to consider cervical stenosis to be a severe impairment or explain why it was not severe, and she "did not include pain as a severe impairment, nor did the ALJ assess the effect of such pain upon Plaintiff's ability to sustain work activity."   (doc. 16 at 7-8.)

At step two, the second ALJ determined that Plaintiff's cervical spondylosis, tenosynovitis, and early carpal tunnel syndrome were her severe impairments.[10]   (*See* R. at 253.)   Because none of Plaintiff's impairments or combination of impairments met or medically equaled a listed impairment at step three, the second ALJ proceeded to assess Plaintiff's RFC. (*See* R. at 253); *see also* 20 C.F.R. § 404.1520a(d)(3); *Boyd*, 239 F.3d at 705 ("If the [claimant's] impairment is severe, but does not reach the level of a listed disorder, then the ALJ must conduct a [RFC] assessment.").   Consideration of all "medically determinable impairments . . . including [those] that are not 'severe,'" and "all of

---

[10]   As discussed, the second ALJ identified early carpal tunnel syndrome as a severe impairment at step two.   According, Plaintiff's argument that the second ALJ did not consider it at step two is not addressed.

the relevant medical and other evidence," is required by the regulations when determining a claimant's RFC.  *See* 20 C.F.R. § 404.1545(a)(2)-(3) (2012); SSR 85–28, 1985 WL 56856, at *3.

In considering the Plaintiff's symptoms, the second ALJ followed a two-step process. (R. at 254.) First, the second ALJ determined whether there was an underlying medically determinable physical or mental impairment, or combination thereof, that could reasonably be expected to produce Plaintiff's pain or other symptoms. (*Id.*)  At this first step, she found that the Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms. (R. at 255.) Second, she evaluated the intensity, persistence, and limiting effects of Plaintiff's symptoms to determine the extent to which they limited her functioning. (*Id.*)

After reviewing the evidence of record—including Plaintiff's treatment notes, Dr. Larkin's various Assurity forms, diagnostic tests, and opinion evidence—the second ALJ determined that she retained a physical ability to lift and carry 10 pounds frequently and 20 pounds occasionally; stand and walk a total of six hours during and 8-hour workday; and sit a total of 6 hours during and 8-hour workday. (R. at 253.)  Additionally, Plaintiff can frequently reach, handle, and finger and occasionally crawl, but she cannot climb ladders, ropes, or scaffolds. (*Id.*)

In reaching this finding, the second ALJ acknowledged Plaintiff's testimony, the medical evaluations by the different doctors, and the diagnostic tests and x-rays. (R. at 254-55.) The second ALJ relied on the primary diagnosis identified by Dr. Larkin in considering Plaintiff's impairments, including finding  cervical spondylosis and early carpal tunnel syndrome were severe impairments. (*See* R. at 255-56) ("The evidence contains twelve reports . . . wherein Dr. Larkin opined that because of bilateral carpal tunnel syndrome (CTS), bilateral foraminal stenosis of the cervical spine,

and pain in the neck, wrist and hands . . . .").[11]  Additionally, the second ALJ considered the medical

testing performed by Dr. Toler and Dr. Larkin's treatment of Plaintiff that "included prescribed, [sic]

medication, clay heating pads, weekly therapy, cream for numbness, and wristbands."  (R. at 254.)

The second ALJ also relied on "the results of the computerized topography scan of the claimant's

cervical spine, x-rays of claimant's right wrist, nerve conduction study, and EMG."  (R. at 257.)

The second ALJ considered it important that Plaintiff's doctors never recommended surgery,

and there was no evidence in the record showing that Plaintiff ever required, sought, or underwent

any extraordinary professional medical care, such as prolonged inpatient hospital care, numerous

emergency room visits, or epidural steroid injections for treatment of her impairments.  (R. at 255.)

The second ALJ also noted that "[d]uring the period at issue, the claimant's professional medical

care . . . [was] provided almost exclusively by Dr. Larkin, and has consisted mostly of trials of

prescribed medications, cursory follow-up office visits and physical therapy."  (R. at 255-56.)  The

second ALJ found "it [is] reasonable to conclude that if the claimant's condition were as disabling

as alleged she would have sought and/or prescribed more aggressive treatment for her condition."

(R. at 256.)

Additionally, the second ALJ emphasized the inconsistency in the treatment noted, medical

records, and test results, and how Plaintiff presented herself to the state agency medical consultants

and third parties. (*See id.*) ("Despite testifying of limited ability to perform activities of daily living

. . . the claimant reported that she can drive a car, shop for household items, prepare light meals, pay

bills, handle a savings account and use a check book. . . . [she] also stated during the consultative

physical examination that she could hold a coffee cup, open jar tops, hold a light skillet, use a broom

---

[11]   In the cervical spine residual functional capacity questionnaire completed by Dr. Larkin on October 8, 2012, he
identified his diagnosis of Plaintiff as "cervical foraminal stenosis, bilateral carpal tunnel syndrome."  (R. at 621.)

and button her clothes."). Further, the second ALJ expressly found that both Dr. Larkin and Dr. Toler "chose to *ignore* the results of diagnostic testing and x-rays," and seemed to base their determination of severity "primarily on the claimant's subjective complaints." (R. at 257) (emphasis added). In contrast, the second ALJ gave the testimony of the consultative experts great weight. For example, the second ALJ expressly "afford[ed] great weight to the assessment and opinion provided by [the ME]" because his "opinion and assessment regarding the claimant's ability to perform work-related activities [were found] to be consistent and supported by the evidence of record." (R. at 257.) As the trier of fact, the second ALJ was entitled to weigh the evidence against other objective findings, including the opinion evidence available, and the record as a whole.

As noted, the ALJ's RFC assessment should be based on all of the relevant evidence in the record and should account for all of the claimant's impairments, including those that are non-severe. *See* 20 C.F.R. § 404.1545(a)(3). The ALJ's determination necessarily includes an assessment of the nature and extent of a claimant's limitations and determines what the claimant can do "on a regular and continuing basis." 20 C.F.R. §§ 404.1545(b)-(c), 416.945(b)-(c);SSR 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996); *accord Dunbar v. Barnhart*, 330 F.3d 670, 672 (5th Cir. 2003) ("Both [20 C.F.R. § 404.1545 (2002) and SSR 96–8p (1996)] make clear that RFC is a measure of the claimant's capacity to perform work 'on a regular and continuing basis.' "). SSR 96-8p distinguished between what the ALJ must consider and what the ALJ must include in her written decision. Here, the second ALJ's narrative discussion shows she applied the correct legal standards and considered all of the relevant evidence in determining Plaintiff's RFC.

Although the second ALJ did not explicitly find that Plaintiff's alleged cervical stenosis or pain  were severe impairments at step two, in her RFC assessment, she expressly considered the

effects of her doctor's diagnoses, including the impairments identified by Dr. Larkin, and "the intensity and/or severity" of "they symptoms produced by these impairments," including the reported "bilateral carpal tunnel syndrome (CTS), bilateral foraminal stenosis of the cervical spine, and pain in the neck wrist and hands." (*See* R. at 253-58.)  She also expressly noted and considered all of the Dr. Larkin's reports and assessments and Plaintiff's own testimony.  (R. at 256.) Additionally, the second ALJ repeatedly considered Plaintiff's alleged pain in determining her RFC. (*See* R. at 253-57.)  In her reply, Plaintiff notes that spinal stenosis causes symptoms consistent with the symptoms identified in her testimony, including pain, tingling, numbness, muscle weakness, and swollen fingers.  (*See* doc. 19 at 6.)  Even if Plaintiff is correct, the second ALJ in considering her testimony considered these symptoms in her RFC assessment. *See* 20 C.F.R. § 404.1545(a)(3) (noting the ALJ's RFC assessment should be based on all of the relevant evidence in the record and should account for all of the claimant's impairments, including those that are non-severe).

At steps four, the second ALJ concluded that Plaintiff was capable of performing her past relevant work as an apartment manager, because "[t]his work did not require the performance of work-related activities precluded by the claimant's [RFC]," and was therefore not disabled.  (R. at 258.)  The second ALJ's disability decision shows that she considered Plaintiff's alleged pain and the diagnoses of her doctors.  To the extent that the second ALJ rejected a diagnosed impairment, as the trier of fact, she was entitled to do so if she found it was not supported by the objective medical evidence.  *See Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000) ("Conflicts in the evidence are for the [ALJ] . . . to resolve.").  At step two, it was still Plaintiff's burden to prove she had an impairment or combination of impairments that rendered her "incapable of engaging in any substantial gainful activity."  *See Milam v. Bowen*, 782 F.2d 1284, 1286 (5th Cir. 1986); *see also*

*Fraga v. Bowen*, 810 F.2d 1296, 1301 (5th Cir. 1987).  A "physical" or "mental" impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C.A. § 423(d)(3) (West 2004).  In determining Plaintiff's severe limitations at step two and RFC, the second ALJ expressly relied on physical examinations and diagnostic findings.  (*See* R. at 257.)

In conclusion, the second ALJ's *Stone* error was harmless with respect to Plaintiff's physical impairments because it is inconceivable that she would have assessed a different RFC—and thereby reached a different disability determination—if she had applied the *Stone* severity standard at step two.  *See* Taylor, 706 F.3d at 603 (finding that the ALJ's failure to cite to *Stone* at step two was harmless, and "remand [was] not required since there [was] no evidence in the record that [the claimant's] mental health claims [were] severe enough to prevent him from holding substantial gainful employment" at step five); *Goodman*, 2012 WL 4473136, at *10 (*Stone* error was harmless where the ALJ considered the effects of the claimant's mental impairments, including those that were not severe, on his ability to work at step four).  Remand is therefore not required on this ground.[12]

## D.    **Medical Opinion**

Plaintiff contends that the second ALJ erred by according inadequate weight to medical opinion evidence from her treating physician in reaching her RFC determination.  (doc. 16 at 2, 8.)

Residual functional capacity, or RFC, is defined as the most that a person can still do despite recognized limitations.  20 C.F.R. § 404.1545(a)(1) (2003).  The RFC determination is a combined "medical assessment of an applicant's impairments with descriptions by physicians, the applicant,

---

[12]   To the extent that Plaintiff argues in her reply that the government "willfully violated the Order of the District Court . . . [and that] a proper sanction might be to strike Defendant's pleadings . . . .," (doc. 19 at 5), this issue was not listed or briefed separately as required by the Scheduling Order issued on November 23, 2015 (doc. 14), and is therefore waived.

or others of any limitations on the applicant's ability to work." *Hollis v. Bowen*, 837 F.2d 1378, 1386–87 (5th Cir. 1988) (per curiam).   The relevant policy interpretation regarding the RFC determination states:

> 1. Ordinarily, RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule.
>
> 2. The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments, including the impact of any related symptoms. . . .

SSR 96–8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996).   The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity." *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985).

Determination of an individual's RFC should be based on all of the relevant evidence in the case record, including opinions submitted by treating physicians or other acceptable medical sources.  20 C.F.R. § 404.1545(a)(3) (2012); SSR 96-8p, 1996 WL 374184, at *1.  Every medical opinion is evaluated regardless of its source, but the Commissioner generally gives greater weight to opinions from a treating source.  20 C.F.R. § 404.1527(c)(2).  A treating source is a claimant's "physician, psychologist, or other acceptable medical source" who provides or has provided a claimant with medical treatment or evaluation, and who has or has had an ongoing treatment relationship with the claimant.  *Id.* § 404.1502.  When "a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence," the Commissioner must give such an opinion controlling weight.  *Id.* § 404.1527(c)(2).

If controlling weight is not given to a treating source's opinion, the Commissioner considers

six factors in deciding the weight given to each medical opinion: (1) whether the source examined the claimant or not; (2) whether the source treated the claimant; (3) the medical signs and laboratory findings that support the given opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is made by a specialist or non-specialist; and (6) any other factor which "tend[s] to support or contradict the opinion." *See id.* § 404.1527(c)(1)–(6).  The "standard of deference to the examining physician is contingent upon the physician's ordinarily greater familiarity with the claimant's injuries. . . . [W]here the examining physician is not the claimant's treating physician and where the physician examined the claimant only once, the level of deference afforded his opinion may fall correspondingly." *Rodriguez v. Shalala*, 35 F.3d 560, 1994 WL 499764, at *2 (5th Cir. 1994) (unpublished) (citing *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990)).  A treating physician's opinion may also be given little or no weight when good cause exists, such as "where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." *Newton v. Apfel*, 209 F.3d 448, 456 (5th Cir. 2000).  If the evidence supports a contrary conclusion, an opinion of any physician may be rejected.  *Id.* at 455; *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1981) (per curiam).

A factor-by-factor analysis is unnecessary when "there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another," or when the ALJ has weighed "the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion." *Newton*, 209 F.3d at 458.  "[A]bsent reliable medical evidence from a treating or examining physician *controverting the claimant's treating specialist*,

26

an ALJ may reject the opinion of the treating physician only if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in [20 C.F.R. § 404.1527(c)]." *Id.* at 453 (emphasis added).

While an ALJ should afford considerable weight to opinions and diagnoses of treating physicians when determining disability, sole responsibility for this determination rests with the ALJ. *Newton*, 209 F.3d at 455. The ALJ's RFC decision can be supported by substantial evidence even if she does not specifically discuss all the evidence that supports her decision, or all the evidence that she rejected. *Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir. 1994). A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record. *Leggett*, 67 F.3d at 564. Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings." *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted). The court "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the [ALJ's] findings." *Id.* (citations omitted) Courts may not re-weigh the evidence or substitute their judgment for that of the Commissioner, however, and a "no substantial evidence" finding is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the ALJ's decision. *See Johnson*, 864 F.2d at 343 (citations omitted).

Here, before proceeding to step four, the second ALJ determined that Plaintiff had the RFC to lift and carry 10 pounds frequently and 20 pounds occasionally; stand and walk a total of six hours during and 8-hour workday; and sit a total of 6 hours during and 8-hour workday. (R. at 253.) Additionally, the second ALJ found that Plaintiff can frequently reach, handle, and finger and

27

occasionally crawl, but she cannot climb ladders, ropes, or scaffolds.  (*Id.*)

As noted, the second ALJ considered all of the medical evidence, including physical examinations and diagnostic findings, in reaching her RFC determination.  (R. at 254-57.)  In reaching her determination, the second ALJ also noted the inconsistencies between Dr. Larkin's medical opinion evidence and the diagnostic testing and x-rays.  (R. at 257.)  After considering in detail the medical evidence provided by Plaintiff, including the various Assurity forms completed by Dr. Larkin, the second ALJ noted:

> The undersigned find[s] that the objective evidence of record including the results of the impartial consultative examination, results of the computerized topography scan of the claimant's cervical spine, x-rays of the claimant's right wrist, nerve conduction study, and EMG . . . *fail to support Dr. Larkin's opinion that the claimant's impairments are disabling*.  Furthermore, because both Dr. Toler and Dr. Larkin *chose to ignore* the results of diagnostic testing and x-rays, the severity of the claimant's complaints seem to be based primarily on the claimant's subjective complaints, whom the undersigned has found the be less credible.

(R. at 257) (emphasis added).

Although Dr. Larkin was Plaintiff's treating physician, the second ALJ found that his medical opinion could not be given controlling weight in determining the RFC because his opinions were inconsistent with other substantial evidence in the record.  *Smith*, 2014 WL 4467880, at *3. Specifically, the second ALJ found that "the opinions and assessment provided by Dr. Larkin [were] inconsistent with and unsupported by the objective evidence of record when considered in its entirety."  (R. at 257.)  The second ALJ focused her comparison on medically acceptable clinical, laboratory, and diagnostic techniques, rather than Plaintiff's subjective complaints to her doctors. (*See id.*)

Additionally, the second ALJ emphasized the inconsistency in the treatment, medical records, and how Plaintiff presented herself to the state agency medical consultants and third parties.

(*See* R. at 256) ("Despite testifying of limited ability to perform activities of daily lining . . . the claimant reported that she can drive a car, shop for household items, prepare light meals, pay bills, handle a savings account and use a check book. . . . [she] also stated during the consultative physical examination that she could hold a coffee cup, open jar tops, hold a light skillet, use a broom and button her clothes.").  She also found that other substantial evidence supported a contrary medical conclusion counter to Dr. Larkin's medical opinions. *Bradley,* 809 F.2d at 1057.  In making this assessment, the second ALJ acknowledged that Dr. Larkin was Plaintiff's treating physician, thereby addressing his examining and treatment relationship with her as well as his relevant knowledge of her physical limitations. *See*  20 C.F.R. § 404.1527(c)(1), (2), (5).  Substantial evidence properly supports the second ALJ's appropriate evaluation of Dr. Larkin's treating source opinions. Accordingly, a reviewing court must defer to the second ALJ's decisions. *See Leggett,* 67 F.3d at 564.

As noted, the second ALJ also relied on Dr. Tavarekere's consultative physical examination and gave significant weight to the ME's testimony. (R. at 256-57.)  She found that his "opinion and assessment regarding the claimant's ability to perform work-related activities to be consistent and supported by the evidence of record."  (R. at 257.)  As the trier of fact, the second ALJ was entitled to weigh the evidence against other objective findings, including the opinion evidence available, and the record as a whole.

Plaintiff contends that the second ALJ afforded little weight to the remainder of the limitations Dr. Larkin found concerning her ability to lift, work on computers, type, or perform repetitive tasks because he found them to be inconsistent with the medical evidence. (doc. 16 at 10.) She contends that since the second ALJ rejected some of Dr. Larkin's medical opinions and failed

to incorporate much of his medical opinion in the RFC, she was required to go through the *Newton* analysis. (*id.* at 9.)

In *Newton*, the ALJ was required to go through the six factors because he rejected the treating physician's opinion as controlling. *Newton*, 209 F.3d at 456. A factor-by-factor analysis is unnecessary, however, when "there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another," or when the ALJ has weighed "the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion." *Id.* at 458. Because the second ALJ relied on competing first-hand medical evidence in this case, including diagnostic testing and x-rays, and she found the ME's opinions were more well-founded that Dr. Larkin's opinions, she was not required to perform a full factor-by-factor analysis. *See id.* Accordingly, even though the second ALJ did not give controlling weight to Dr. Larkin's medical opinions, she did not need to go through the *Newton* factors. *See* 20 C.F.R. § 404.1527(d)(2).

Plaintiff also argues it was "ridiculous" for the second ALJ to consider the letter guaranteeing payment to Dr. Larkin out of Plaintiff's social security claim, if successful. (doc. 16 at 11.) She provides no authority in support of her position, however. (*See* docs. 16, 19.) Additionally, the letter was part of the medical record submitted to the second ALJ at the hearing. (*See id.*) The transcript of the hearing on December 4, 2014, reflects that all exhibits through 10F, including the letter, were admitted into evidence without objection from Plaintiff. (R. at 316.) Accordingly, the letter was properly considered.

Nevertheless, the letter was only one factor identified by the second ALJ in considering Dr.

30

Larkin's opinions. (*See* R. at 257.) The second ALJ expressly stated in her decision that "[she] finds that the opinions and assessments provided by Dr. Larkin to be inconsistent with and unsupported by the objective evidence of record when considered in its entirety." (*Id.*) Only after the second ALJ made that finding, which was based on objective medical evidence, did the second ALJ state that "[she] further finds that Dr. Larkin's opinions and assessments to be self-serving and influenced by the prospect of secondary gains." (*Id.*) Accordingly, even if the second ALJ should not have considered the letter, the she still found that Dr. Larkin's medical opinions could not be given controlling weight in determining the RFC because they were inconsistent with other substantial evidence on the record.

Since the second ALJ afforded the appropriate weight to the treating physician's opinions, remand is not required on this issue.

## E.    Credibility

 Plaintiff contends that the second ALJ's credibility determination was not supported by substantial evidence because she "improper[ly] substituted her own medical opinion." (doc. 16 at 12-13.)

Social Security Ruling: SSR 96–7p requires the ALJ to follow a two-step process for evaluating a claimant's subjective complaints. SSR 96–7p, 1996 WL 374186, at *2 (S.S.A. July 2, 1996). First, the ALJ must consider whether the claimant has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. *Id.* Once such an impairment is shown, the ALJ must evaluate the intensity, persistence, and limiting effects of the alleged symptoms to determine the extent to which they limit the individual's ability to do basic work activities. *Id.* If the claimant's statements concerning the intensity, persistence, or limiting effects

of pain or other symptoms are not substantiated by objective medical evidence, the ALJ must make

a credibility finding regarding the claimant's statements. *Id.*; *Falco*, 27 F.3d at 164 (citing *Scharlow*

*v. Schweiker*, 655 F.2d 645, 648-49 (5th Cir. 1985)).

The ALJ's credibility determination must be based on a consideration of the entire record,

including medical signs and laboratory findings, and statements by the claimant and her treating or

examining sources concerning the alleged symptoms and their effect.   SSR 96–7p, 1996 WL

374186, at *2.   The ALJ must also consider a non-exclusive list of seven relevant factors in

assessing the credibility of a claimant's statements:

1.      the claimant's daily activities;
2.      the location, duration, frequency, and intensity of pain or other symptoms;
3.      factors that precipitate and aggravate symptoms;
4.      the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms;
5.      treatment, other than medication, for relief of pain or other symptoms;
6.      measures other than treatment the claimant uses to relieve pain or other symptoms (e.g., lying flat on his or her back);
7.      and any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms.

*Id.* at *3.

Although the ALJ must give specific reasons for her credibility determination, "neither the

regulation nor interpretive case law requires that an ALJ name, enumerate, and discuss each factor

in outline or other rigid, mechanical form. It suffices when the administrative decision is sufficiently

specific to make clear that the regulatory factors were considered." *Prince v. Barnhart*, 418 F. Supp.

2d 863, 871 (E.D. Tex. 2005).   Moreover, the Fifth Circuit has explicitly rejected the requirement

that an ALJ "follow formalistic rules" when assessing a claimant's subjective complaints. *Falco*,

27 F.3d at 164.   The ALJ's evaluation of the credibility of subjective complaints is entitled to

judicial deference. *See Carrier v. Sullivan*, 944 F.2d 243, 247 (5th Cir. 1991).   The ALJ is in the

best position to assess a claimant's credibility, since she "enjoys the benefit of perceiving first-hand the claimant at the hearing." *Falco*, 27 F.3d at 164 n.18.

Here, the second ALJ acknowledged that Plaintiff's medically determinable impairments could be expected to cause her alleged symptoms, but she concluded from the entire record that her testimony about the intensity, persistence, and limiting effects of her symptoms was not entirely credible. (R. at 255.)  After consideration of the evidence, but not in a formalistic fashion, the second ALJ addressed several of the credibility factors listed in SSR 96-7p, which went towards the duration, frequency, and intensity factors. (*Id.* at 254-57.)  She first discussed Plaintiff's past work, Dr. Larkin's initial diagnosis, and related treatment, including usage of over-the-counter Tylenol for headaches and use of "prescribed, [sic] medication, clay heating pads, weekly therapy, cream for numbness, and wristbands" for her other pain. (R. at 254.)  The second ALJ also noted that "the claimant testified her treating physician has never recommended surgery" and she has not "ever required, sought and/or undergone any other extraordinary professional medical care." (R. at 255.)  She also noted that  Plaintiff's medical treatment has "almost exclusively" been provided by Dr. Larkin and consisted of trials of prescribed medications, cursory follow-up office visits, and physical therapy. (R. at 255-56.)  The second ALJ concluded this part of her analysis by noting that she "[found] it reasonable to conclude that if the claimant's condition were as disabling as alleged she would have sought and/or been prescribed more aggressive treatment for her condition." (R. at 256.)  The second ALJ stated that she carefully considered the entire record and concluded that Plaintiff's statements concerning the intensity, persistence and limiting effects of these symptoms were not credible to the extent they conflicted with the RFC assessment. (*See* R. at 255-56.)

Plaintiff argues the second ALJ erred in her credibility determination by placing importance

on the fact that she was not prescribed nor seek out "more aggressive treatment." (doc. 16 at 13.) As noted, based on the entire record, the second ALJ "[found] it reasonable to conclude that if the claimant's condition were as disabling as alleged she would have sought and/or been prescribed more aggressive treatment for her condition." (R. at 256.) Plaintiff, however, contends, "The ALJ is not a physician. . . . An ALJ is not free to substitute his or her medical opinion for the opinion of a treating physician whose testimony is uncontroverted." (doc. 16 at 13.) Courts have considered the use of over-the-counter pain medication to support an adverse credibility finding concerning allegations of pain. *See Parfait v. Bowen*, 803 F.2d 820, 813-14 (5th Cir. 1986) (determining that a claimant who receives conservative pain treatment substantially supports an ALJ's adverse credibility finding regarding debilitating and severe pain); *see also Villa*, 895 F.2d at 1024 (stating that the ALJ was not precluded from relying on the lack of prescribed treatment as an indication of nondisability); *Hollis v. Bowen*, 837 F.2d 1378, 1384 (5th Cir. 1988) (recognizing "that an absence of objective factors indicating the existence of severe pain-such as limitations in the range of motion, muscular atrophy, weight loss, or impairment of general nutrition-can itself justify the ALJ's conclusion."). The ALJ must consider subjective evidence of pain, but it is within her discretion to determine the pain's disabling nature. *Dunbar v. Barnhart*, 330 F.3d 670, 672 (5th Cir. 2003). The ALJ's evaluation of the credibility of subjective complaints is entitled to judicial deference. *Carrier*, 944 F.2d at 247. Plaintiff has not shown that the second ALJ erred by relying on the fact that she never took more aggressive steps after her conservative treatment failed to improve her condition over several years in making an adverse credibility determination.

The second ALJ's discussion shows that she relied primarily on the medical evidence of record to find Plaintiff not credible. Although not in a formalistic fashion, she also considered the

34

factors for determining credibility and adequately explained her reasons for rejecting Plaintiff's subjective complaints, and there is substantial evidence to support her determination. *See Falco*, 27 F.3d at 164. Therefore, remand is not required on this issue.

### III.  RECOMMENDATION

The Commissioner's decision should be **AFFIRMED**.

**SO RECOMMENDED** this 2nd day of September, 2016.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

### INSTRUCTIONS FOR SERVICE AND
### NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE